**UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

| | |
|---|---|
| PATRICK AYERS and JOHN WATT, Derivatively on Behalf of CURO GROUP HOLDINGS CORP.,<br><br>    Plaintiffs,<br><br>v.<br><br>CHAD FAULKNER, ANDREW FRAWLEY, DON GAYHARDT, DAVID M. KIRCHHEIMER, CHRIS MASTO, MIKE MCKNIGHT, DOUG RIPPEL, DALE E. WILLIAMS, KAREN WINTERHOF, WILLIAM BAKER, ROGER W. DEAN, FRIEDMAN FLEISCHER & LOWE CAPITAL PARTNERS II, L.P., FFL EXECUTIVE PARTNERS II, L.P., and FFL PARALLEL FUND II, L.P.,<br><br>    Defendants,<br><br>and<br><br>CURO GROUP HOLDINGS CORP.,<br><br>    Nominal Defendant. | Case No. _____<br><br>JURY TRIAL DEMANDED |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiffs Patrick Ayers and John Watt ("Plaintiffs"), by their undersigned attorneys, derivatively and on behalf of Nominal Defendant CURO Group Holdings Corp. ("CURO" or the "Company"), files this Verified Stockholder Derivative Complaint against Chad Faulkner ("Faulkner"), Andrew Frawley ("Frawley"), Don Gayhardt ("Gayhardt"), David M. Kirchheimer ("Kirchheimer"), Chris Masto ("Masto"), Mike McKnight ("McKnight"), Doug Rippel ("Rippel"), Dale E. Williams ("Williams"), Karen Winterhof ("Winterhof"), William Baker ("Baker"), and Roger W. Dean ("Dean") (collectively, the "Individual Defendants"), and certain

entities associated with Friedman Fleischer & Lowe Capital Partners II, L.P., FFL Executive Partners II, L.P., and FFL Parallel Fund II, L.P. (collectively, the "FFL Defendants," and together with the Individual Defendants, "Defendants") for violations of the federal securities laws, breaches of their non-exculpable fiduciary duties, and other wrongdoing. The Individual Defendants are all current CURO senior officers and/or members of the Company's Board of Directors (the "Board"). Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding CURO, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## I.    INTRODUCTION

1.      This shareholder derivative action is brought on behalf and for the benefit of CURO and is based on breaches of fiduciary duties, waste of corporate assets, unjust enrichment, violations of federal securities laws, and other misconduct committed from approximately April 26, 2018 through the present (the "Relevant Period") by the Individual Defendants, who are all current directors and/or officers of CURO.

2.      CURO provides lending services to nonprime, underbanked customers in need of cash. Underbanked customers are those who have greater difficulty accessing lending services from mainstream banking institutions, due to issues such as poor credit history and inadequate income levels. During the Relevant Period, CURO provided these lending services in the United States and Canada.

3.    CURO's most profitable single line of business was its Canadian "single-pay" loans. "Single-pay" loans are commonly referred to as "payday" loans.

4.    In 2016 and 2017, new laws and regulations in Canada created various restrictions on single-pay loans. For example, in multiple Canadian provinces, the maximum allowable interest rate that "payday lenders" could charge was reduced. These restrictions decreased CURO's yield on single-pay loans in Canada. This is relevant given that CURO generated significant revenues and profits from its Canadian operations.

5.    In response to the new laws and regulations in Canada, the Individual Defendants formulated a strategy in the first quarter of 2018 ("Q1 2018") to transition CURO's Canadian business from single-pay loans to installment and "open-end" loan products. Pursuant to that strategy, the Company started to convert single-pay customers to installment and open-end loans in Alberta, Canada. The Company then opened test stores in one market in Windsor, Ontario, before effecting the transition in the broader Ontario market.

6.    The Individual Defendants knew that CURO would generate less profit from open-end loans than from its historical single-pay loans given the following, among others: (i) the maximum interest rates CURO could charge on open-end loans was less than comparable single-pay loans; (ii) the revenue on open-end loans takes longer to build; and (iii) pursuant to accounting rules, CURO was required to account for increased loan losses "upfront" (at the time of origination) for open-end loans as compared to single-pay loans.

7.    During mid-2018, the Individual Defendants relayed to stockholders that the transition from CURO's single-pay loan business (historically, its most profitable business) would occur over several years rather than in the immediate or near future; that single-pay loans would remain viable; and that the negative impact would be minimal, would be confined to the second

{00226387.DOCX; 1 }

3

quarter of 2018 ("Q2 2018"), and had been factored into CURO's publicly-reported 2018 earnings guidance.

8.      Yet, the Individual Defendants deliberately concealed from shareholders that they had already begun rapidly transitioning from single-pay loans to open-end loans in Ontario, Canada.  The majority of the losses (mainly as a result of increased "charge offs") from the transition had already occurred by July 2018.

9.      Moreover, the Individual Defendants re-affirmed CURO's fiscal 2018 earnings guidance in April 2018 and again in July 2018, despite causing the rapid transition to open-end loans and knowing that it rendered the earnings guidance unattainable.

10.     During this time (April 2018 to October 2018) when the Individual Defendants were concealing the problems facing CURO, the stock price was artificially inflated and certain of the Individual Defendants took advantage of this fact by selling shares of CURO stock.

11.     On May 17, 2018, the Individual Defendants approved a secondary stock offering of CURO common stock (the "Secondary Offering").  Individual Defendants Faulkner and McKnight and the FFL Defendants sold approximately 4.5 million shares for a price totaling approximately $98 million. Moreover, the Secondary Offering was not conducted to benefit the Company; the proceeds were not used for acquisitions, debt repayment, operational expenditures, or anything tenuously connected to improving the Company. Rather, the Secondary Offering was conducted to handsomely line the pockets of top Company insiders.  Also, the Registration Statement on SEC Form S-1 failed to disclose any of the financial impacts of CURO's transition from single-pay to open-end loans.  This was material information that should have been disseminated to shareholders.

12.     On October 24, 2018, CURO announced dismal third quarter 2018 ("Q3 2018") financial results, reporting adjusted diluted Earnings Per Share ("EPS") of only $0.23 and widely missing analysts' consensus EPS by over 50%. Defendants reported that "[b]y far the biggest impact to quarterly results," including an 8.8% year-over-year decline in Canadian revenue, "was the ongoing product migration in Canada, specifically in the province of Ontario." Furthermore, despite Defendants' representations just months earlier that CURO had a "very high degree of confidence" in achieving or even surpassing the Company's full year 2018 earnings guidance, the Company suddenly and significantly cut its full year 2018 earnings guidance for adjusted EPS, net income, and adjusted earnings before interest, tax, depreciation, and amortization ("EBITDA").

13.     During the Company's Q3 2018 earnings conference call, Individual Defendant Gayhardt "acknowledge[ed] that this quarter fell short of our expectations, and probably your expectations, and quite simply, is not up to our standards," and Gayhardt proceeded to admit that Defendants knew the Company's full year 2018 earnings guidance was unattainable at the time they reaffirmed it on April 27, 2018 and July 31, 2018, reporting, "we did a less than stellar job of explaining in our – probably our July call or even back into our April call . . . the impact of [the Canadian transition] . . . in the near term . . . we probably didn't lay it out for everybody as explicitly as we probably should have." During the Company's Q3 2018 earnings conference call, Individual Defendant Dean further confirmed that the "majority" of the loss for Q3 2018 "came in July," prior to Defendants' false statements and omissions on July 30-31, 2018. In response to the news, the price of CURO common stock fell by almost 34%.

14.     Defendants finally admitted that the decision to move forward with the introduction of open-end loans in Ontario from 2019 to 2018 was made during Q1 2018; that they deliberately decided not to moderate the transition from single-pay loans to open-end loans in Ontario, despite

the known operational risks; that the transition to open-end loans in Canada "came at the expense of single-pay loan balances," which declined 50% in Q3 2018 year-over-year; that the rapid transition was "dilutive to Canadian earnings in the near term"; that Canadian adjusted EBITDA decreased by more than 50% year-over-year as a consequence of the transition; and that the Company had converted nearly 40,000 customers to open-end loans in Q3 2018, but expected to convert only 4,000 to 5,000 a month in the coming months.

15.     Contravening certifications on CURO's quarterly reports filed with the SEC, Defendants further disclosed that the Company's "disclosure controls and procedures were not effective." On May 6, 2019, the Company revealed in its Form 10-Q for the quarter ended March 31, 2019 ("10-Q Q-1 2019") that it had "received an inquiry from the SEC regarding the Company's public disclosures surrounding its efforts to transition the Canadian inventory of products from Single-Pay loans to Open-End loans."

16.     Moreover, a securities fraud class action lawsuit was filed in 2018 against CURO and certain officers and/or directors in the United States District Court for the District of Kansas captioned *Yellowdog Partners, LP v. CURO Group Holdings Corp., et al.*, Case No. 2:18-cv-02662-JWL-KGG (the "Securities Class Action"). The Securities Class Action was settled with the payment by Defendants of $8,980,000 to CURO shareholders who purchased CURO stock during the class period. As a result, the Company suffered monetary and other damage as a result of the litigation and settlement of the Securities Class Action, including but not limited to monies paid by the Company out-of-pocket for its defense of the Securities Class Action.

17.     The defendants in the Securities Class Action filed a motion to dismiss, which was denied in full by the District Court in December 2019, despite materially heightened pleading standards applicable to federal securities fraud claims.

{00226387.DOCX; 1 }

6

## II.    JURISDICTION AND VENUE

18.    This Court has jurisdiction under 28 U.S.C. §1331 because certain of the claims asserted herein arise under §§10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act").

19.    This Court also has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367.

20.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

22.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because Nominal Defendant CURO is headquartered in this District and conducts business in this District.

## III.    PARTIES

### Plaintiffs

23.    Plaintiffs are each current shareholders of CURO common stock and each has continuously held CURO common stock during the Relevant Period to the present.

### Nominal Defendant

24.    Nominal Defendant CURO is incorporated in Delaware and is headquartered at 3527 North Ridge Road, Wichita, Kansas 67205. The Company describes itself as "a growth-oriented, technology-enabled, highly-diversified, multi-channel and multi-product consumer finance company serving a wide range of underbanked consumers in the United States and Canada." The Company does business in the U.S. under two principal brands, "Speedy Cash" and

{00226387.DOCX; 1 }

"Rapid Cash," as well as under the "Avio Credit" brand. The Company does business in Canada under the "Cash Money" and "LendDirect" brands. According to CURO's 2020 10-K, as of December 31, 2019, CURO has 416 store locations throughout fourteen states in the United States and seven Canadian provinces, and the Company has online services in twenty-seven states in the United States and five Canadian provinces. CURO's common stock began trading on the New York Stock Exchange ("NYSE") upon its Initial Public Offering ("IPO") on December 7, 2017. The Company trades under the ticker symbol "CURO."

## The Individual Defendants

25.     Individual Defendant McKnight co-founded CURO and has been a director of the Company since 1997. From 1997 to 2008, McKnight served as Vice President of the Company and was involved with the Company's strategic direction and governmental affairs. McKnight co-owns, with the other co-founders of CURO, certain real estate companies which lease corporate office, collection office and certain retail store space to CURO. McKnight sold 500,000 shares of CURO stock at artificially inflated prices, generating proceedings totaling over $10.9 million.

26.     Individual Defendant Masto has been a director of the Company since 2008. Masto is a Senior Advisor at FFL Partners, a private equity firm, which he co-founded in 1997. Masto was a partner and member of the Investment Committee at FFL Partners until 2017. During the Relevant Period, Masto served as a member of the Board's Compensation and Nominating and Corporate Governance Committees.

27.     Individual Defendant Rippel co-founded CURO and has served as Executive Chairman of the Board since 2012. Before that, Rippel was Chairman of the Board from 2008 to 2012, Chief Executive Officer ("CEO") of CURO from 1997 to January 2012, and Secretary and Treasurer of CURO from 1997 to 2008.

{00226387.DOCX; 1 }

8

28.     Individual Defendant Faulkner co-founded CURO and has been a director of the Company since 1997. Faulkner was the President and Chief Operating Officer ("COO") of CURO from 1997 to 2013 and currently serves as a director of certain of the Company's wholly-owned subsidiaries.

29.     Individual Defendant Gayhardt has been the Company's CEO since 2012, the Company's President since 2013, and a director of the Company since December 2012. Prior to joining CURO, Gayhardt was employed in various capacities at Dollar Financial Corp., now known as DFC Global Corp. ("DFCGC"), between 1990 to 2008, including as DFCGC's President from 1998 to 2008. Like CURO, DFCGC's business focuses on providing financial services to unbanked and underbanked consumers.

30.     Individual Defendant Frawley has been a director of the Company since December 2017. During the Relevant Period, Frawley served on the Board's Audit and Compensation Committees.

31.     Individual Defendant Kirchheimer has been a director of the Company since December 2018. During the Relevant Period, Kirchheimer served on the Board's Audit and Compensation Committees.

32.     Individual Defendant Williams has been a director of the Company since 2017 and is the current Chair of the Audit Committee.

33.     Individual Defendant Winterhof has been a director of the Company since 2016 and is currently a director of FFL Partners.

34.     Individual Defendant Baker joined the Company in 2007 and has served in various executive positions throughout his tenure. Baker has been the COO of CURO since 2016. Prior to becoming COO, Baker was the Company's Chief Marketing Officer from September 2011 until

{00226387.DOCX; 1 }

2016 and Vice President of Marketing and Business Development from April 2007 until September 2011. The Company credits Baker with leading "the launch of the Company's digital business and the development of the risk and analytics function."

35.     Individual Defendant Dean has been the Company's Executive Vice President and Chief Financial Officer ("CFO") since May 2016.

36.     Defendants Faulkner, Frawley, Gayhardt, Kirchheimer, Masto, McKnight, Rippel, Williams, Winterhof, Baker, and Dean are referred to herein as the "Individual Defendants."

37.     Defendants Faulkner, McKnight, and Rippel are co-founders of the Company and are collectively referred to herein as the "Founder Defendants."

38.     As of the filing of the Company's 2019 10-K, the Company's directors and senior officers owned approximately 21 million shares of CURO common stock which amounts to 51.46% of the total outstanding shares.  This outright majority ownership does not even include the FFL Defendants' stock ownership. The FFL Defendants' stock ownership is described below.

**The FFL Defendants**

39.     The FFL Defendants invested heavily in CURO in 2008.  CURO has acknowledged this pivotal role, exclaiming in its public filings that the FFL Defendants have "contributed significant resources to helping define our growth strategy."

40.     Upon the Board's approval of the Secondary Offering, the FFL Defendants sold 3,497,411 shares at $21.85 per share, for an artificially inflated cumulative price of over $76 million.  Pursuant to the sale, the FFL Defendants' ownership of total common stock and voting power decreased from 29% to 21.23%.

41.     According to CURO's public filings, the Founder Defendants and the FFL Defendants controlled CURO and collectively had the power to elect all of the members of CURO's Board and "thereby control[led] [CURO's] policies and operations, including the

{00226387.DOCX; 1 }

10

appointment of management." The Founder Defendants and the FFL Defendants exerted actual

control over both CURO and the Individual Defendants throughout the Relevant Period. The

Company's 2019 10-K explicitly states:

> *Friedman Fleischer & Lowe Capital Partners II, L.P. and its affiliated*
> *investment funds ("FFL Holders") and the original founders of the company*
> *("Founder Holders") together own more than 50% of our common stock, and*
> *their interests may conflict with ours or yours in the future.*
>
> *At December 31, 2019, FFL Holders and Founder Holders owned approximately*
> *11.8% and 47.7%, respectively, of our outstanding common stock. As a result, the*
> *FFL Holders and the Founder Holders collectively have the ability to elect all of*
> *the members of our Board of Directors and thereby control our policies and*
> *operations, including the appointment of management,* future issuances of our
> common stock or other securities, the payment of dividends, if any, on our common
> stock, the incurrence or modification of debt by us, certain amendments to our
> amended and restated certificate of incorporation and amended and restated bylaws,
> and the entering into of extraordinary transactions, and their interests may not in all
> cases be aligned with your interests. In addition, the FFL Holders together with
> Founder Holders may have an interest in pursuing acquisitions, divestitures and
> other transactions that, in their respective judgment, could enhance their
> investment, even though such transactions might involve risks to you. For example,
> the FFL Holders together with the Founder Holders could cause us to make
> acquisitions that increase our indebtedness or cause us to sell revenue-generating
> assets.
>
> In connection with the completion of our IPO, we entered into the Amended and
> Restated Investors Rights Agreement with certain of our existing stockholders,
> including the Founder Holders and Freidman Fleisher & Lowe Capital Partners II,
> L.P. (and its affiliated funds, the "FFL Funds"), whom we collectively refer to as
> the principal holders. Pursuant to the Amended and Restated Investors Rights
> Agreement, we have agreed to register the sale of shares of our common stock held
> by the stockholders party thereto under certain circumstances. We completed a
> registration pursuant to these registration rights in May 2018.
>
> The FFL Holders are in the business of making investments in companies and may
> from time-to-time acquire and hold interests in businesses that compete directly or
> indirectly with us.

(Emphasis in original).[1]

---

[1] Unless otherwise indicated, all emphasis herein is added.

42.     The Founder Defendants and the FFL Defendants, by virtue of their positions as majority stockholders and/or directors, had control over the Company's policies and operations and thereby had the power, influence, and clout to cause the Company to perpetrate the unlawful conduct described herein. Because of their positions of control, the Founder Defendants and the FFL Defendants had the power to, and did, directly or indirectly, control the Board and the conduct of CURO's business.

## IV.     FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

43.     By reason of their positions as officers and/or directors of CURO, and because of their ability to control the business and corporate affairs of CURO, the Individual Defendants owed CURO and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage CURO in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of CURO and its shareholders so as to benefit all shareholders equally.

44.     Each director and officer of the Company owes to CURO and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

45.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of CURO, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

46.     To discharge their duties, the officers and directors of CURO were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

47.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good

{00226387.DOCX; 1 }

12

faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of CURO, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

48.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

49.     To discharge their duties, the officers and directors of CURO were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of CURO were required to, among other things:

{00226387.DOCX; 1 }

13

   (a)  ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to CURO's own Code of Business Conduct & Ethics (the "Code of Conduct");

   (b)  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

   (c)  remain informed as to how CURO conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

   (d)  establish and maintain systematic and accurate records and reports of the business and internal affairs of CURO and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

   (e)  maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that CURO's operations would comply with all applicable laws and CURO's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

   (f)  exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

   (g)  refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

50.     Each of the Individual Defendants further owed to CURO and the shareholders the duty of loyalty requiring that each favor CURO's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

51.     At all times relevant hereto, the Individual Defendants were the agents of each other and of CURO and were at all times acting within the course and scope of such agency.

52.     Because of their advisory, executive, managerial, and directorial positions with CURO, each of the Individual Defendants had access to adverse, non-public information about the Company.

53.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by CURO.

## V.     CURO'S CODE OF CONDUCT

54.     CURO's Code of Business Conduct & Ethics (the "Code of Conduct") explicitly applies to all the Board members and officers of the Company. It is "designed to promote . . . honest and ethical conduct . . . full, fair, accurate, timely and understandable disclosure in the reports and documents CURO files with, or submits to, the Securities and Exchange Commission." Among other things, pursuant to the Code of Conduct, the Individual Defendants were required to adhere to the following requirements at all times:

## BUSINESS PRACTICES

In our business operations, we deal fairly with our customers, colleagues and stockholders. We maintain accurate business records and comply with laws and regulations regarding financial disclosures and audits.

### Financial Disclosures

CURO is committed to providing full, fair, accurate, timely and understandable disclosure in reports and documents that we file with, or submit to, the SEC and other regulatory agencies and in other public communications we make. You are required to comply with CURO's policies and procedures for compiling such disclosures and ensuring that they are full, fair, accurate, timely and understandable. If you contribute in any way to the preparation or verification of CURO's financial statements and other financial information, you must ensure that CURO's books, records and accounts are accurately maintained. You must cooperate fully with CURO's legal, accounting and internal audit departments, as well as CURO's independent public accountants and outside counsel. If you are involved in CURO's disclosure process, you must: (a) be familiar with and comply with CURO's disclosure controls and procedures and its internal control over financial reporting; and (b) take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of CURO provide full, fair, accurate, timely and understandable disclosure.

### Insider Trading

United States and international securities laws prohibit certain transactions involving securities (e.g., purchases or sales of CURO's stock, exercise and sale of CURO stock options) by persons who are aware of material information that is not generally known by or available to the public. These laws also prohibit persons who are aware of material non-public information from "tipping," which means disclosing this information to others. In addition to possible fines and penalties to you, CURO's reputation and prospects could suffer and our brand could be impaired if these laws are not followed. You may not purchase or sell CURO stock while in possession of material non-public information regarding CURO, nor may you purchase or sell another company's securities while in possession of material non-public information regarding that company. It is against CURO's policies and illegal for you to use material non-public information regarding CURO or any other company to: (a) obtain profit, or (b) directly or indirectly "tip" others who might make an investment decision on the basis of that information.

You must review CURO's Insider Trading Policy, a copy of which can be requested from the Legal Department. Additionally, you can contact the Legal Department to learn more about material, non-public information, prohibited transactions and trading windows.

{00226387.DOCX; 1 }

## VI.   CURO'S AUDIT COMMITTEE CHARTER

55.   CURO's Audit Committee Charter requires that members of the Audit Committee

assist the Board in monitoring, among other things: (i) the integrity of the Company's financial

statements, (ii) the design and implementation of the Company's internal audit function, (iii) the

qualifications, independence and performance of the Company's independent auditor, and (iv) the

Company's compliance with legal and regulatory requirements.

56.   Moreover, the Audit Committee Charter specifically provides that the Audit

Committee members have the following duties:

1.   Review the policies and procedures adopted by the Company to fulfill its
     responsibilities regarding the fair and accurate presentation of financial
     statements in accordance with generally accepted accounting principles
     ("GAAP"), applicable rules of the SEC and the NYSE Rules.

2.   Review the Company's accounting and financial reporting processes.

3.   Review audits of the Company's financial statements.

4.   Review and discuss with Senior Management and the Company's Vice
     President of Internal Audit:(a) the Independent Auditor's responsibilities
     under generally accepted auditing standards and the responsibilities of
     Senior Management in the audit process, (b) the overall audit strategy, (c)
     the scope and timing of the annual audit, (d) any significant risks identified
     during the Independent Auditor's risk assessment procedures and (e) when
     completed, the results, including significant findings, of the annual audit.

5.   Review and approve the Company's Annual Report on Form 10-K (the "10-
     K") and Quarterly Reports on Form 10-Q (the "10-Qs").

6.   Review and discuss with the Independent Auditor, Senior Management and
     the Company's Vice President of Internal Audit any information regarding
     consultation and technical advice opinions sought by Senior Management
     from any other accounting firm with respect to the accounting treatment of
     a particular event or transaction.

7.   Review and discuss reports from the Independent Auditor regarding: (a) all
     critical accounting policies and practices to be used by the Company; (b) all
     alternative treatments of financial information within GAAP that have been
     discussed with Senior Management, including ramifications of the use of
     such alternative disclosures and treatments and the treatment preferred by

the Independent Auditor; (c) other material written communications between the Independent Auditor and Senior Management, such as any management letter or schedule of unadjusted differences; and (d) any other matters regarding which the Independent Auditor is required, or chooses, to discuss or report to the Committee under applicable standards of the Public Company Accounting Oversight Board ("PCAOB") or otherwise.

8.    Review all certifications required to be made by the Company's Chief Executive Officer and Chief Financial Officer (the "CFO") in connection with the Company's periodic reports under the Act or pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act ("SOX").

9.    Meet to review and discuss with Senior Management and the Independent Auditor the Company's annual audited financial statements and quarterly financial statements in the 10-K and 10-Qs, respectively, as well as the specific disclosures made under the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" of such reports.

10.   Recommend to the Board that the Company's audited financial statements be included in the 10-K.

11.   Review and discuss the Company's earnings press releases (including type and presentation of information, paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information), as well as financial information and earnings guidance provided to the public, analysts and ratings agencies. The Committee may discuss these matters generally and need not discuss these matters in advance of each earnings release or each instance where earnings guidance is provided.

12.   Prepare and approve the report required by the rules of the SEC to be included in the Company's annual meeting proxy statement in accordance with the requirements of Item 7(d) of Schedule 14A and Item 407(d)(3)(i) of Regulation S-K.

13.   In compliance with the Company's Related Person Transactions Policy, review and oversee all related party transactions that are required to be disclosed pursuant to Item 404 of Regulation S-K on an ongoing basis and, if appropriate, approve any such transactions.

14.   Review and discuss with the Independent Auditor the Independent Auditor's evaluation of the Company's identification of, accounting for, and disclosure of its relationships with related parties, including any significant matters arising from the audit regarding the Company's relationships and transactions with related parties.

15.     Meet separately, periodically, in executive sessions with Senior Management, the Company's Vice President of Internal Audit and the Independent Auditor.

## VII.   ALLEGATIONS

### A.     CURO's Background and Product Offerings

57.     CURO was founded in Riverside, California in 1997. The Company describes itself as "a growth oriented, technology-enabled, highly diversified consumer finance company serving a wide range of underbanked consumers." The Company provides lending services to individuals who cannot or who have difficulty attaining loans from traditional or mainstream banking services, due to issues such as poor credit history or inadequate income levels. The Company generally services customers who have a FICO credit score of 660 or less.

58.     Through various growth initiatives, such as bolstering operational competencies, making acquisitions, and developing new brands, among others, the Company has widened its footprint across the United States and Canada. The Company had historic operations in the United Kingdom, but this segment of the business had been discontinued. CURO's Canadian stores are branded "Cash Money" and the Company offers "LendDirect" installment loans online and at certain stores.

59.     During the Relevant Period, CURO's Canadian operations accounted for a significant amount of the Company's profitability. During 2017, CURO's Canadian segment generated 19% of revenues and accounted for approximately 19.5% and 55% of gross margin and pre-tax income, respectively. During 2018, Canadian operations accounted for approximately 12% of gross margin and generated pre-tax income of approximately $17 million, while its United States operations generated pre-tax income of only $1.1 million. The Ontario market was especially important to CURO's operations. In 2017, nearly 13% of the Company's total

consolidated revenues came from Ontario, which was the Company's third largest geographic region after California and Texas.

60.     Throughout the Relevant Period, the Individual Defendants consistently touted CURO's proprietary IT platform, called the "CURO Platform," for every aspect of the Company's underwriting and scoring of its loan products.  Among other information, the CURO Platform records transactional history by store and customer, thereby allowing the Company to track loan originations, payments, defaults, payoffs, and historical collection activities on past-due accounts. The CURO Platform allows CURO to make data-driven changes to its acquisition and risk models. Furthermore, the Company uses the CURO Platform to determine whether to it should extend credit to prospective customers and the terms on which to provide credit.

61.     During the Relevant Period, CURO offered single-pay loans, installment loans, and open-end lines of credit, and certain ancillary financial products such as credit protection insurance, gold buying, and check cashing.

62.     This shareholder derivative action was necessitated by the wrongful and fraudulent actions taken during CURO's transition from single-pay loans to open-end loans.

63.     Single-pay loans, also known as "payday loans," are generally short-term, small denomination, and high-yield loans that provide customers with immediate cash in consideration for a post-dated personal check or a pre-authorized debit from the customer's bank account. CURO charges customers a fee based on the amount of money borrowed. In exchange for charging its customers principal and interest, CURO postpones deposit of the check or debit from the customer's account until the pre-planned and contractually set loan due date.

64.     In contrast to single-pay loans, open-end loans are a lower yield line of credit without a specified maturity date.  An open-end loan customer can borrow against his line of credit,

repay with minimum, partial, or full payment, and redraw as needed. CURO earns interest on the outstanding loan balances drawn by the customer against their approved credit limit.

65.     Payday loans are unsecured; in other words, they are not backed by collateral in the event of default. A home mortgage, for example, is backed by collateral (and in this case, the collateral is the house itself). If a homeowner ceases to pay his mortgage, the creditor can take title and possession of the house and, subject to certain laws, effectuate a sale to collect the unpaid debts. On the other hand, payday loans do not come with collateral and are therefore unsecured loans. Since the payday loan is unsecured, credit losses are a considerable and an inherent part of offering this type of product.

66.     In accordance with Generally Accepted Accounting Principles ("GAAP"), CURO is mandated to generate an accounting reserve for probable accounting losses (in this case, probable amounts of debt non-repayment). To establish and maintain its allowance for loan losses, CURO takes a "provision," which is a periodic charge against its earnings. Calculating the provision for losses requires CURO to integrate and analyze an assortment of mathematical measures and qualitative factors regarding the loans originated by CURO.

67.     When conducting accounting practices for installment and open-end loan, CURO is required to reserve for expected losses through a provision at the time of origination, even though revenues from those loans cannot be recognized until payments on the loan balances are collected from customers over time. As the Company transitioned from small, short-term single-pay loans to larger, longer-term open-end loans, CURO had to account for larger "up-front" provisions (or charges) against expected credit losses. CURO's average single-pay loan was approximately $600 while the average open-end loan was approximately $2,400, with the average amount drawn of approximately $1,800, which is three times the size of the average payday loan.

{00226387.DOCX; 1 }

21

68.     Given that CURO's open-end loan balances are considerably higher than that of single-pay loans, the Company was required to take materially higher up-front provisions.

## B.     Proliferation Of Canadian Laws And Regulations Aimed At Single-Pay Loans Causes CURO's Canadian Business Operations To Suffer

69.     Until the formation of this new regulatory landscape, CURO's most profitable line of business had been Canadian single-pay loans. These single-pay loans, otherwise known as "payday" loans, generated yields as high as 400%. Moreover, the credit losses were both modest and predictable. For the full fiscal year 2017, single-pay loans accounted for 27.9% of the Company's total revenues, nearly half of which (15%) were derived from Canada.

70.     The proliferation of Canadian laws and regulations aimed at single-pay loan posed a considerable threat to the profitability of CURO's single-pay loan business.

71.     Historically speaking, payday loans were a significant revenue and profit generator for CURO because these loans were issued with very high interest rates. For example, single-pay loans can have yearly interest rates ranging from 200% to more than 500%, depending on the set of regulations in the state or province in which the loan is issued. Maximum interest rates are set by the provinces in Canada.

72.     Moreover, when borrowers cannot otherwise repay their loans by the specified due date, said borrowers often take out another single-pay loan to make the re-payment on the original loan. Taking on additional debt, especially when other debt has not been repaid, causes the interest rate attached to the additional debt to be even higher than it otherwise would be. Many payday loan borrowers become stuck in a high-interest rate and long-term debt spiral that is difficult to break free from.

73.     In recognition of the high interest rates and the nature of single-pay loans, governmental authorities maintain, and, in Canada, have increased, their oversight of the payday

{00226387.DOCX; 1 }

lending industry. The Canadian provinces' single-pay loan lending regulations generally concern cost of borrowing and related caps, disclosure requirements, collection activity requirements, and restrictions on certain types of lending practices.

74.     In the years prior to the Relevant Period, numerous Canadian provinces began passing new legislation governing payday loan transactions, such as reducing the maximum interest rate allowable under law. These interest rate reductions placed a formidable barrier on CURO's ability to maintain payday loan-derived profits similar to that which it had been earning.

75.     In May 2016, Canada's Alberta provincial government introduced Bill 15, "An Act to End Predatory Lending," which lowered the borrowing rate for single-pay loans from C\$23 to C\$15 for every C\$100 borrowed, making it the lowest rate in Canada. Moreover, the proposed legislation contained clauses mandating that lenders permit debtors to repay payday loans in installments, rather than all at once. Furthermore, this proposed law contained provisions forbidding lenders from directly soliciting prospective customers, forbidding lenders from charging a fee to cash a check for a payday loan, and forbidding lenders from making a loan while another remains unpaid and overdue. In August 2016 the C\$15 maximum rate became effective and in November 2016 the final regulations for the installment payments became effective.

76.     In November 2016, the Ontario provincial government passed new legislation creating mandatory reductions in the maximum cost of borrowing payday loans from C\$21 to C\$18 for every C\$100 borrowed. On January 1, 2017, this new legislation became effective.

77.     Effective January 1, 2017, the British Columbia provincial government passed legislation creating mandatory reductions in the maximum cost of borrowing single-pay loans from C\$23 to C\$17 for every C\$100 borrowed. When the British Columbia Ministry reported this

{00226387.DOCX; 1 }

23

regulatory change, it also proclaimed that it was assessing whether it should place additional and stronger regulatory pressures on the single-pay loan industry.

78.     In December 2017, the Ontario provincial government again strengthened regulatory pressures on the single-pay loan industry, passing legislation which created mandatory reductions in the maximum cost of borrowing single-pay loans from C$18 to C$15 for every C$100 borrowed. On January 1, 2018, this the new regulation became effective. The Ontario government announced further amendments effective July 1, 2018, that required: (i) a mandatory extended payment plan for borrowers with three or more loans with the same lender within a sixty-three-day period; (ii) a requirement that the loan amount cannot exceed 50% of the customer's net pay in the month prior to the loan; and (iii) mandatory disclosures in advertisements and loan agreements about the cost of borrowing a payday loan. CURO's Ontario operations consisted of 133 stores out of a total of 202 as of the end of the 2019 calendar year.

79.     Given that these regulatory pressures were aimed at the single-pay loan industry and directly affected CURO's business operations, the Individual Defendants closely monitored and routinely discussed the Canadian regulatory environment and any proposed or final regulations in the Company's SEC filings. The Individual Defendants also spoke about the topic on every quarterly earnings conference call since becoming a publicly traded Company, and regularly provided updates on existing or proposed legislation and answered questions from analysts about the impact of new regulations.

80.     As a direct and natural consequence of the legislation passed in Alberta, British Columbia, and Ontario, which, among other things, reduced the interest rates on payday loans, CURO's yields on single-pay loans fell dramatically. For example, in 2016, the yields on single-

{00226387.DOCX; 1 }

24

pay loans in Canada were nearly 400%, but by the first quarter of calendar 2018 ("10-Q Q1 2018"), single-pay loan yields had declined significantly to around 250%.

81.     The Individual Defendants recognized that single-pay loans were no longer the profit-generating vehicle that they had once been, given the plethora of legislation aimed directly at these lending products.

82.     As a result, the Individual Defendant decided to transition from single-pay loans in Canada to other lending products such as installment and open-end loans.

83.     The Ontario market was very important to CURO's business operations. As mentioned, the Ontario market was CURO's third-largest geographical market, after California and Texas, and, in 2017, nearly 13% of the Company's total consolidated revenues came from Ontario. Accordingly, the Company's ability to replace single-pay loan revenues with installment and open-end loan revenues was especially pertinent. Since open-end loans have lower average yields than payday loans, CURO had to significantly increase the total dollar value of open-end loan issuances to neutralize the reduced profitability effects that would otherwise stem from the reduced interest rates that it would charge.

## C.     The Individual Defendants Create And Effectuate A Single-Pay Loan To Installment And Open-End Loan Transition Plan

84.     Given the increased regulatory pressures placed on single-pay loans throughout multiple Canadian provinces, the Individual Defendants created and implemented a strategy aimed at transitioning customers in Alberta and Ontario from single-pay loans to installment and open-end loans. Alberta and Ontario cumulatively accounted for 80% of the Company's Canadian revenues.

85.     The transition first commenced in Alberta, whereby the Individual Defendants engaged in an effort to persuade existing single-pay customers to switch to installment and open-

{00226387.DOCX; 1}

end loans and whereby CURO acquired open-end customers who had not formerly been payday loan customers. The Individual Defendants proclaimed that "converting existing customers [was] going excellent" and that the demand for installment and open-end loans was strong.

86.    In CURO's fourth quarter 2017 ("10-Q Q4 2017"), the Company started opening LendDirect loan offices in Ontario, which focused on unsecured installment and open-end loans, rather than payday loans. In February 2018, CURO started testing open-end loans in the Windsor, Ontario market and converted almost 3,000 payday loans to open-end loans during the first testing phase. CURO opened additional stores in Ontario, and the Individual Defendants conveyed that the Company was "very pleased" with the foot traffic, take-up rate, and first-pay default rates on its open-end loan product.

87.    During Q1 2018 the Individual Defendants decided to accelerate the transition from single-pay loans to open-end loans in the Ontario market by an entire year, from 2019 to 2018. The Individual Defendants told stockholders during CURO's 10-Q Q1 2018 earnings conference call on April 27, 2018 that despite the recent rate changes in Ontario, the Company's transition from single-pay loans to open-end loans in Canada would not be immediate or rapid but would occur over the "next couple of years," that the Company had "anticipated" the regulatory changes, and that single-pay lending would remain "viable in Ontario."

88.    The "next couple of years" statement was far from the truth. Rather, the Individual Defendants had already planned and/or caused CURO to engage in a rapid transition from single-pay to open-end loans. In fact, Gayhardt essentially admits to this in October 2018, after the truths regarding the Company and the misrepresentations had been revealed.

89.    During the Company's 10-Q Q1 2018 earnings conference call, Gayhardt also conveyed that the up-front provisioning resulting from the Canadian transition would have a de-

minimis effect on the Company's operations, stating that as the Company continued to grow its open-end business, "the revenue and profitability from [installment and open-end] products [would] lag a little bit just because of the way you have to provision upfront."

90.     The Individual Defendants further assured stockholders that the Company had "anticipated" any increased upfront provisioning from the Canadian transition "when we developed our forecast and our guidance" and that there was nothing "going on in terms of mix shift or the overall kind of growth trends" that was out of line with the Company's forecast.

91.     During the April 27, 2018 earnings conference call, the Individual Defendants re-affirmed the Company's 2018 earnings guidance, conveying that they were "very happy to affirm" the Company's fiscal year 2018 earnings guidance. The 2018 earnings guidance included adjusted EBITDA between of $245 million to $255, net income between $110 million to $116 million, and EPS of $2.25 to $2.40.

92.     These statements mislead stockholders, causing them to believe that the CURO's transition from single-pay loans in Canada would not materially impact the Company's financial results, including the Company's ability to maintain and meet the fiscal year 2018 earnings guidance.

## D.     Insider Trading at Artificially Inflated Prices Facilitated Through a Secondary Stock Offering Authorized by Individual Defendants

93.     On May 14, 2018, the Individual Defendants approved a Secondary Offering, filed on the Registration Statement on Form S-1 with the SEC. On May 17, 2018, CURO conducted the Secondary Offering.

94.     The insider stock sales conducted pursuant to the Secondary Offering resulted in an artificially inflated cumulative price of $109,250,000. Moreover, the Company did not receive any of the $109,250,000 in proceeds. The Secondary Offering was facilitated by the Individual

{00226387.DOCX; 1 }

Defendants so that they or their fellow directors and/or officers could enrich themselves at the expense and to the detriment of the Company.

95.     The Individual Defendants were incentivized to mispresent and not disclose CURO's actual financial condition so that they could maximize the monetary amount received by insiders, including but not limited to Individual Defendants Faulkner and McKnight and the FFL Defendants, who in total sold 3,497,411 shares of stock at \$23.00 per share, generating proceeds of approximately \$76 million.     Individual Defendants Faulkner and McKnight made approximately \$11 million each from their stock sales in the Secondary Offering.

96.     The Registration Statement on Form S-1 for the Secondary Offering was signed by Individual Defendants Faulkner, Frawley, Gayhardt, Masto, McKnight, Rippel, Winterhof, and Williams.

97.     The Secondary Offering would have been significantly less advantageous to Individual Defendants Faulkner and McKnight and the FFL Defendants had the truth been disclosed that the Individual Defendants had and were causing CURO to rapidly transition from single-pay loans to open-end loans in Canada, which was detrimentally altering the Company's financial condition and had made the Company's fiscal year 2018 earnings guidance unattainable.

98.     The Individual Defendants, who were controlled by the Founder Defendants and the FFL Defendants, caused the Secondary Offering to occur despite knowing that material, adverse information regarding the Company's operations and prospects had not been disclosed to stockholders, thereby causing and/or permitting exorbitant stock sales at artificially inflated prices.

## E.     Individual Defendants Fail to Disclose the Adverse Financial Effects of the Transition from Single-Pay to Open-End Loans

99.     In May 2018, the Individual Defendants accelerated the Company's transition from single-pay loans to open-end loans in Ontario.  At the behest of the Individual Defendants, CURO

formulated strategy and implemented initiatives to persuade single-pay loan customers to become open-end loan customers at the Company's remaining 107 locations in Ontario. Moreover, the Individual Defendants also caused CURO to attract open-end loan customers who had previously not been customers of CURO.

100.    Rather than conducting a transition from single-pay loans over the "next couple of years," as proclaimed by Gayhardt, CURO rapidly concluded the majority of the transition just months later, by July 2018. This led to a predictable, negative impact to CURO's Q3 2018 operations, prospects, and financial results, including the Company's ability to maintain and meet its fiscal year 2018 earnings guidance.

101.    In order to effectuate their resolve to rapidly finish the transition to open-end loans in Ontario, the Individual Defendants caused the Company to commence a considerably large advertising program through mediums such as direct mailing, cable TV, and others. CURO's marketing program was successful; shareholders would later be told that CURO transitioned almost 40,000 single-pay loan customers to open-end loans by the end of Q3 2018.

102.    Since CURO had mainly solicited existing single-pay customers, the CURO Platform already had intricate and comprehensive data about those customers, such as information regarding originations, payments, defaults, and payoffs. The CURO Platform furnished this information to the Individual Defendants. Despite this, the Individual Defendants knew, or were reckless with respect to not knowing, that open-end loan customers were being issued higher-denomination loans (at lower interest rates), resulting in larger loan balances and therefore higher up-front provisioning (to account for increases in credit losses), which had a corresponding and materially adverse impact on CURO's operations and financial results.

103.    Although the Individual Defendants could have channeled the flow of customers from single pay to open-end loans, they chose not to do so, despite knowing that the rapid transition to open-end loans in Ontario entailed detrimentally high operational risks (risks that later materialized).

104.    Furthermore, instead of being honest and up-front with stockholders about the risks and trade-offs in conducting a quicker transition from single-pay to open-end loans, the Individual Defendants chose to hide this information from stockholders. While announcing CURO's second quarter ("Q2") 2018 earnings results, the Individual Defendants re-affirmed their "confidence" in the Company's fiscal year 2018 earnings guidance and significantly downplayed and mischaracterized impacts to the Company's financial results.

105.    By way of example, during CURO's Q2 2018 earnings conference call on July 31, 2018, the Individual Defendants furnished an update on the "early stage of a very successful introduction transition of a big part of our Ontario lending business of the legacy single-pay loan product to a[n] [open-end] line of credit that's been very well received by our customers." The Individual Defendants stated for the first time that the Company had moved the transition to open-end loans in Ontario from 2019 to 2018. Yet, the Individual Defendants did not disclose the truth – that the majority of the transition and the associated losses had already occurred.

106.    Further, although the Company mentioned that the transition could "impact earnings for the full year versus our plan" and that the ongoing Canadian transition was "too fluid" to discount a bit of downside risk, the Company once again re-affirmed its previously announced full year 2018 earnings guidance. Moreover, Gayhardt stated to investors that he had a "very high degree of confidence in achieving" full year guidance and that there was "a good likelihood that we'll come out ahead on our internal forecasts and our published guidance."

{00226387.DOCX; 1 }

107.    On July 30, 2018 and July 31, 2018, when the Individual Defendants made these statements, the Company had already completed the majority of the transition from single-pay loans to open-end loans in Ontario. This transition had a material, adverse effect on the Company's operations, significantly reducing CURO's single-pay loan revenues, causing large credit loss provisions, and thereby creating a situation in which CURO could not maintain or meet the full year 2018 earnings guidance. Nonetheless, stockholders were re-assured on multiple occasion that the Company would fulfill its full year 2018 earnings guidance, including during the July 30 and 31, 2018 period when shareholders had been told that the Company had a "very high degree of confidence in achieving" the earnings guidance.

108.    Due to the information provided by the CURO Platform, the Individual Defendants knew and failed to disclose the following: (i) that the Company's rapid transition from "payday" loans to open-end loans in Ontario had resulted in more loans with larger loan balances and, consequently, higher up-front provisioning; (ii) the Company's advertising costs had increased exorbitantly in the effort to transition "payday" loan customers to open-end loan customers and to capture new customers; and (iii) the transition to open-end loans had substantially reduced single-pay revenue which made CURO's full year 2018 earnings guidance unattainable.

F.    **The Individual Defendants Consistently Reaffirm the Significance of CURO's Canadian Operations**

109.    Among CURO's Canadian regions, Ontario was the largest and accounted for two-thirds of the Company's Canadian revenues. Moreover, Ontario accounted for almost 13% of CURO's total consolidated revenues as of December 31, 2017. The Individual Defendants knew that increased regulatory pressures in Canada had the potential to materially affect CURO's operations and financial results. As such, the Individual Defendants closely tracked the changing regulatory landscape in Canada and discussed the Canadian regulatory environment in CURO's

{00226387.DOCX; 1 }

press releases and SEC filings. Further, the Individual Defendants discussed and answered questions concerning the changing Canadian regulatory landscape during their prepared remarks on each quarterly earnings call during the Relevant Period.

110.    By way of example, in CURO's Form 10-K filed on March 13, 2018 ("2017 10-K"), the Individual Defendants used multiple pages to elaborate on "Canadian Regulations" and discussed the new regulations in Ontario effective on January 1, 2018 and July 1, 2018.

111.    During the April 27, 2018 and July 31, 2018 earnings conference calls, Gayhardt discussed the new regulations in Ontario and conveyed to shareholders that the Company had "anticipated these changes." The Individual Defendants' consistently repeated references to the Canadian regulations before and throughout the Relevant Period, thereby supporting the reasonable inference that the Individual Defendants closely monitored the regulatory changes in Canada and were monitoring any actual or potential impacts to CURO's operations as a result.

112.    This reasonable inference is buttressed by the fact that CURO's Canadian payday loans were historically the Company's "most profitable single line of business," generating yields of nearly 400% in the years leading to the Relevant Period. The Company's payday loan yields declined markedly once provinces such as Alberta, Ontario and British Columbia enacted regulations decreasing the maximum interest rate chargeable on single-pay loans. These yields decreased from 400% to around 250% by Q1 2018.

113.    Moreover, the Individual Defendants admitted during the Stephens Fall Investment Conference that the Canadian regulatory pressures placed on single-pay loan lenders caused the Individual Defendants to transition to open-end loans.

114.    Clearly, single-pay loans in Canada were important to CURO's operations, prospects, and financial condition, and it is therefore reasonable to conclude that the Individual

Defendants were closely involved in the decision to rapidly finish the transition to open-end loans and, therefore, knew or recklessly disregarded that CURO's operations and financial results would suffer a material, adverse impact as CURO briskly-transitioned from its most profitable, high-yield product (single-pay loans) to a less profitable, lower-yield product (open-end loans).

G. **Additional Data Further Bolstering the Assertion That Defendants Had Knowledge of the Rapid Transition and its Considerable Effects on the Company's Business, Operations, and Prospects**

115.    The Individual Defendants' statements during the Relevant Period confirm that they knew that the transition from payday loans to open-end loans would be viewed advantageously by customers in Ontario given the open-end loan's lower interest rates, which would lead to more open-end loan issuances and larger loan balances per loan issuance. The larger loan balances would then result in higher up-front provisioning to account for credit losses of a higher magnitude.

116.    For one, the rapid Q3 2018 transition in Ontario was timed to coincide with the historic, reoccurring, and highly probable period of increased loan demand in Canada. In CURO's 2017 10-K, the Individual Defendants relayed that CURO "typically experience[d]" its "highest demand in Canada in the third and fourth calendar quarters."

117.    Second, the Individual Defendants had years of experience with open-end loans and multiple months of data demonstrating Canadian consumers' preference for such loans, a fact which is not surprising given the lower interest rates. During the Stephens Fall Investment Conference, the Individual Defendants conveyed that CURO had been "operating a line of credit for 11 years" stating, we "know how to do" open-end loans, as CURO had been offering open-end loans in the U.S. for the previous five years.

{00226387.DOCX; 1 }

118.     Clearly, the Individual Defendants had significant experience with the performance of open-end loans, thereby informing their expectations for the performance of open-end loans in Canada.

119.     Moreover, since Q4 2017, the Individual Defendants had been closely monitoring the conversion to open-end loans in Canada. As a consequence of the transition starting in Alberta, the Individual Defendants "had a lot of experience in the data" CURO collected from its customers before the Company "pulled the trigger on Ontario."

120.     CURO established open-end loan test stores in Windsor, Ontario during the Relevant Period, and therefore had an even more comprehensive set of data regarding the single-pay loan to open-end loan transition.   The Individual Defendants closely monitored the performance and results of these test stores and markets, monitoring metrics such as acquisition costs, credit performance, foot traffic, take-up rates, first-pay defaults, line utilization, adjusted EBITDA margins, revenue per store, and provision for losses.

121.     The Windsor, Ontario test stores had generated "incredibly favorable" results with positive "take-up rates," good "conversion rates" from existing customers, and a "healthy number of new customers."

122.     Certain of the Individual Defendants would later admit during the Stephens Fall Investment Conference that the Individual Defendants had "five months of seasoning in [the open-end loan] universe in Ontario" before they decided to rapidly complete the majority of the transition from single-pay loans to open-end loans by July 2018.

123.     During the transition in Ontario, the Individual Defendants focused primarily on persuading single-pay loan customers to convert to open-end loan customers, and the Individual Defendants therefore had access to pre-existing, intricate, and comprehensive customer

information through the CURO Platform, including data such as prior payment history, which the Individual Defendants pronounced as "the most predictive element" in gauging loan performance. According to the Company's records, CURO converted 38,000 single-pay loan customers to open-end loan customers in Q3 2018 alone.

124.    Third, because CURO's prospective and actual customer base is financially vulnerable, it is a reasonable to conclude that the Individual Defendants knew, or were reckless in not knowing, that CURO's single-pay customers would move at the opportunity to have access to more cash on more favorable interest rate and repayment terms, thereby resulting in larger open-end loan balances and increased up-front provisioning (to account for increased credit losses).

125.    CURO's average single-pay loan was approximately $600 and the average open-end loan was approximately $2,400. Customers who are issued an open-end loan need not confront the hassle of completing a new application on every occasion that more cash is needed. Customers taking out a line of credit only have to apply once and, if approved, can request cash advances as often as they need up to the available credit limit. Based on these facts, it is reasonable to infer that the Individual Defendants knew or recklessly disregarded that the Company would experience a sudden increase in the amount of open-end loans when it rapidly sought to complete the transition to open-end loans in Ontario in Q3 2018.

126.    Fourth, the Individual Defendants knew, or recklessly disregarded, that as they made the decision to accelerate the timing of transitioning single-pay loans to open-end loans in Ontario, the Company's credit loss provisions would increase in tandem with the increase in open-end loan balances. This inference is bolstered by the fact that the Individual Defendants were well aware that the Company was required to take an upfront provision on the open-end loans it originated, as this loan loss provision metric was closely monitored and reported by CURO to

shareholders as a performance metric in the Company's Relevant Period SEC filings, press releases, and conference calls.

127.  Fifth, the Individual Defendants also knew or recklessly disregarded that the Company's multi-channel marketing plan, finalized in the second half of June 2018, would increase advertising costs, result in a greater number of customers contracting for open-end loans, and cause an increase in up-front provisioning to account for credit losses. This would necessarily have a further negative effect on the Company's financials. This reasonable inference is further confirmed by Gayhardt's statements, wherein he said: "if you live in Ontario . . . unless you're kind of living in a cave, we think we've reached you multiple times with this advertising."

128.  The cost of CURO's advertising campaign was reflected in the Company's 10-Q Q3 2018 results, which noted a 37% increase in advertising costs from the prior quarter due to "acquiring more installment and open-end customers versus single-pay," expanding "cable TV and direct mail spend and other media spend, especially in July" when the Company "introduced open-end in Ontario," and "new product expansion, including our LendDirect stores."

129.  Each of the aforementioned allegations independently demonstrate that the Individual Defendants knew or recklessly disregarded that CURO's transition from single-pay loans to open-end loans would have a materially adverse impact on CURO's financial results.

## VIII.  MATERIALLY FALSE AND/OR MISLEADING STATEMENTS PERPETRATED BY THE INDIVIDUAL DEFENDANTS

### A.  Financial Results for First Quarter 2018

130.  On April 26, 2018, the Individual Defendants caused CURO to issue a press release announcing the Company's financial results for the quarter ended March 31, 2018 and affirmed CURO's fiscal 2018 earnings guidance ("Q1 2018 Press Release"). The Q1 2018 Press Release stated:

Fiscal 2018 Outlook

The Company affirms its full-year 2018 adjusted earnings guidance, a non-GAAP measure that excludes the $11.7 million of debt extinguishment costs from the retirement of $77.5 million of the 12.00% Senior Secured Notes due 2022 and stock-based compensation, as follows:

- Revenue in the range of $1.025 billion to $1.080 billion

- Net Income in the range of $110 million to $116 million

- Adjusted EBITDA in the range of $245 million to $255 million

- Estimated tax rate of 25% to 27% for the full year

- Adjusted Diluted Earnings per Share of $2.25 to $2.40

131.   The Q1 2018 Press Release also discussed changes in the Canadian regulatory landscape and juxtaposed CURO's Q1 2018 results to the previous year's financial results, noting decreasing single-pay revenue and greater open-end loan balances as a result of the Company's transition single-pay loans to installment and open-end loans:

Single-Pay revenues were flat year-over year. The effect of Single-Pay receivables growth was offset by regulatory changes in Ontario, Canada. Open-End revenues rose 52.0% on organic growth in the U.S. and the introduction of Open-End products in Virginia and Canada.

* * *

Open-End loan balances increased by $25.9 million compared to March 31, 2017 from year-over-year growth in Kansas and Tennessee of 12.2% and 8.6%, respectively, the 2017 launch of Open-End in Virginia and conversion in the fourth quarter of 2017 of a portion of Canada Unsecured Installment loans to Open-End loans. The provision for losses and Open-End Allowance for loan losses as a percentage of Open-End gross loans receivable remained consistent with the previous quarter.

* * *

Single-Pay revenue and combined loans receivable during the three months ended March 31, 2018 were affected primarily by regulatory changes in Canada (rate changes in Ontario and British Columbia) and continued product shift from Single-Pay to Installment and Open-End loans in all countries.

132. Juxtaposing CURO's Q1 2018 Canadian sector results to the same period in 2017,

the Q1 2018 Press Release stated:

Revenue in Canada was impacted by the product transition in Alberta from Single-Pay loans to Unsecured Installment and Open-End loans and the impact of regulatory rate changes in Ontario and British Columbia. Canada revenue improved $4.7 million, or 11.3% to $46.3 million for the three months ended March 31, 2018 from $41.6 million in the prior year period. On a constant currency basis, revenue was up $2.6 million, or 6.3%.

\* \* \*

The provision for losses increased $2.3 million or 22.7% to $12.6 million for the three months ended March 31, 2018 compared to $10.2 million in the prior year period, primarily due to relative loan volumes and mix shift from Single-Pay loans to Unsecured Installment and Open-End loans. On a constant currency basis, provision for losses increased $1.8 million, or 17.2%.

\* \* \*

Operating expenses increased $1.6 million, or 45.5%, to $5.0 million in the three months ended March 31, 2018, from $3.4 million in the prior year period, due to . . . expansion of the LendDirect business, and product shifts from Single-Pay loans to Unsecured Installment and Open-End loans.

133. Prior to the market's opening on April 27, 2018, the Individual Defendants

conducted a conference call to elaborate on CURO's operations and Q1 2018 financial results.

During the call, Individual Defendants Baker, Dean, and Gayhardt spoke positively about the

Company's financial results, the Company's operations, and the single-pay loan to open-end loan

transition. Gayhardt went as far to credit the Company's transition out of single-pay products as

one of the "key drivers" of the Company's "growth" and stated:

Current 4 key drivers for this growth: First is the continued mix shift in our products to install the (inaudible) lines of credit, which, together, accounted for 71.4% of our total revenue, up from 57.2% in the prior year quarter. . . .

134.   Individual Defendant Gayhardt also elaborated on "anticipated" regulatory changes and their impact on Ontario single-pay loans, and he assured the market of the ongoing "viability" of Ontario's single-pay product:

> In Canada, new rules came into effect in Ontario and lowered the maximum rate from $18 per $100 lent to $15 per $100 lent effective January 1 of this year. And we're working to incorporate a new extended payment plan and an ability to repay guideline for release on July 1. We had anticipated these changes and believe that Single-Pay lending remains viable in Ontario, although we will continue to expand our Installment and Open-End offerings in Ontario and other provinces.

135.   Gayhardt concluded his prepared remarks by stating, "*we're very happy to affirm the guidance we gave you in January*" and assured investors that "*I'm relatively certain we have a much higher degree of confidence in delivering on those numbers, and we look forward to discussing guidance in more detail after our June quarter.*"

136.   Individual Defendant Dean also stated that CURO was "affirming full year 2018 adjusted earnings guidance" and declared that the Company "continue[d] to anticipate revenue in the range of $1.025 billion to $1.080 billion and with continued solid growth in the U.S. and U.K. being offset partially by declines in Canada from the additional regulatory changes in the middle of the year."

137.   Individual Defendant Dean further "affirm[ed] adjusted EBITDA in the range of $245 million to $255 million, adjusted net income in the range of $110 million to $116 million and adjusted diluted earnings per share in the range of . . . $2.25 to $2.40."

138.   Moreover, Individual Defendant Gayhardt clearly conveyed to shareholders that upfront provisioning (to account for increased credit losses) associated with the transition to open-end loans was already "anticipated" and factored into the Company's "2018 forecast" and "guidance," stating:

Canada, as you mentioned, we are seeing much more pronounced kind of mix shift from Single-Pay to Installment. We went through that in Alberta. We're growing the LendDirect business in the stores, [went] online in Ontario, which is about 2/3 of our overall Canadian business. *You'll start to see more of that as well, so there'll be some of that provisioning, but I think we're -- we had anticipated that and when we developed our forecast and our guidance, we -- there's nothing really going on in terms of mix shift or the overall kind of growth trends, it's that it's out of line with our forecast.*

139.   During the same call, Gayhardt assured shareholders that the transition in Canada

from single-pay loans to open-end loans would occur "over the next couple years," rather than

occurring rapidly or imminently:

So Canada is 13%, Canada Single-Pay is 13% of total revenue, that's down from 15% last year. I suspect you'll see that Canada number probably cut in half over the next couple of years and maybe even go lower than that depending on how -- what the take-up rate and success rate of our line of credit product is there. . . .

And Canada, I suspect that 13% will be cut in half over the next couple of years as well. So you could see 23% between Canada and U.S. Single-Pay revenue. I think you could see that number go, that combined number go below 10% in the next couple of years.

140.   On May 3, 2018, the Individual Defendants caused CURO to file its Form 10-Q

("10-Q Q1 2018"), which confirmed the Company's previously announced financial results and

financial position.

141.   The 10-Q Q1 2018 also represented that management's disclosures, controls, and

procedures were effective: "Based on an evaluation of our disclosure controls and procedures as

of the end of the period covered by this report conducted by our management, with the participation

of the Chief Executive Officer and Chief Financial Officer, the Chief Executive Officer and Chief

Financial Officer concluded that these controls and procedures were effective as of March 31,

2018."

142.   The 10-Q Q1 2018 elaborated on the Canadian segment, stating:

Revenue in Canada was impacted by the product transition in Alberta from Single-Pay to Unsecured Installment and Open-End loans and the impact of regulatory rate changes in Ontario and British Columbia. Canada revenue improved $4.7 million, or 11.3% to $46.3 million for the three months ended March 31, 2018 from $41.6 million in the prior year period. On a constant currency basis, revenue was up $2.6 million, or 6.3%.

* * *

The provision for losses increased $2.3 million, or 22.7% to $12.6 million in the three months ended March 31, 2018 from $10.2 million in the prior year period, primarily due to relative loan volumes and the mix shift from Single-Pay loans to Unsecured Installment and Open-End loans. On a constant currency basis, provision for losses increased $1.8 million, or 17.2%.

* * *

Operating expenses increased $1.6 million, or 45.5%, to $5.0 million in the three months ended March 31, 2018, from $3.4 million in the prior year period, due to increased collections and customer support payroll expenses from seasonality, increased volumes, expansion of the LendDirect business, and product shifts from Single-Pay loans to Unsecured Installment and Open-End loans. On a constant currency basis, operating expenses increased $1.3 million, or 39.2%.

143.    On May 14, 2018, the Individual Defendants caused CURO to file a Registration Statement on Form S-1 with the SEC for the Secondary Offering, and on May 17, 2018, caused CURO to file its prospectus (together, the "Secondary Offering Documents"). The Secondary Offering Documents incorporated by reference the Company's Q1 2018 Press Release and 10-Q Q1 2018, which (i) misrepresented and failed to disclose the adverse effects that the transition from single-pay to installment and open-end loans in Canada would have on CURO's financial results; (ii) failed to disclose that the transition to open-end loans would cannibalize single-pay revenue, i.e., many open-end customers would have been single-pay customers but for the Company's transition; (iii) rather than being cut in half "over a couple of years," Canadian single-pay revenue would be reduced by 50% from Q3 2017 to Q3 2018; and (iv) the Company's disclosure controls

were not operating effectively, directly contravening management's representations which affirmed the effectiveness of the Company's disclosure controls and procedures in 10-Q Q1 2018.

## B.   Financial Results for Second Quarter 2018

144.   On July 30, 2018, the Individual Defendants caused CURO to submit a press release announcing its financial results for the quarter ended June 30, 2018 (the "Q2 2018 Press Release"). In the Q2 2018 Press Release, Gayhardt once again conveyed his "confidence" that CURO would meet its "full year guidance," stating:

> We are pleased to announce year-over-year loan growth of 26.9% and sequential loan growth of 14.1%, adjusted earnings growth in the first half of 2018 of 18.9%, and the execution of a milestone bank partner agreement that allows us to expand our lending footprint in the U.S. Our momentum, improvement in credit metrics and solid loan growth has further bolstered our confidence in our full year earnings guidance.

145.   The Q2 2018 Press Release re-affirmed CURO's 2018 guidance for adjusted net income, adjusted EBITDA, and adjusted diluted EPS, but did not disclose material facts regarding the Company's transition from payday loans to installment and open-end loans. CURO assured the market that any "accelerated open-end growth" was having a negligible effect on the Company's single-pay balances.

146.   Prior to the market's opening on July 31, 2018, the Individual Defendants led a conference call to talk about CURO's operations and Q2 2018 financial results. During this conference call, Individual Defendants Gayhardt, Dean and Baker spoke positively about CURO's transition from payday loans to open-end loans and the Company's financial results. Gayhardt spoke about CURO's second quarter from an "operational standpoint" and noted the "successful introduction" of the transition in Ontario, and stated:

> We made great progress on . . . the early stage of a very successful introduction transition of a big part of our Ontario lending business of the legacy single-pay loan product to a line of credit that's been very well-received by our customers.

{00226387.DOCX; 1 }

We'll unpack the Ontario transition in some detail later on, but it's a big undertaking that's going very well and is running well ahead of schedule. We did all this while maintaining our credit and other financial disciplines. These are big projects that require many people from many departments to work together, and we're incredibly proud of all of our CURO team members for giving this a huge effort this quarter.

147.    Individual Defendant Gayhardt stated that the payday loan to open-end loan transition was "too fluid" to "completely discount a bit of downside risk" on CURO's full-year 2018 guidance, but nonetheless cushioned investors' concerns about any adverse impact to the Company's financial position by re-affirming the Company's full-year 2018 guidance. Gayhardt remarked about CURO's "high degree of confidence" in achieving guidance. Gayhardt also conveyed to investors that there was a "good likelihood" that the Company would meet and "come out ahead" on the 2018 earnings guidance:

We are affirming our guidance today . . . we have a very high degree of confidence in achieving our guidance objections. And, obviously, today we're about 60% of the way through the year, so that certainly helps. And our confidence in our core business and products is very high. It's probably just that the Canadian product transition and the U.K. affordability issue are both too fluid for us to completely discount a bit of downside risk on both those fronts.

So looking at our current forecast, we expect our Canadian and U.K. operations to fall short of our operating earnings plan for the full year 2018 in the range of $10 million -- that's U.S. $10 million. So sitting here today, we do think, as I just mentioned, the U.S. business will be able to make – to more than make up for these projected international shortfalls, and we believe that there's a good likelihood that we'll come out ahead on our internal forecasts and our published guidance.

148.    Furthermore, Gayhardt relayed to shareholders that the Company had "moved up" the commencement of the Ontario transition from 2019 to Q2 2018, but he concealed from the market that the majority of the Ontario transition had already occurred as of July 31, 2018 and that the transition made the Company's FY 2018 guidance unattainable. Specifically, Gayhardt stated:

First, in Canada, as I mentioned earlier, ongoing changes in the provincial regulation of single-pay lending in Canada, coupled with our growing

competencies in marketing, underwriting and servicing line of credit products, brought us to the *decision to accelerate the transition of our product offerings, particularly in Ontario, which accounts for about 2/3 of our Canadian revenue.*

Although we anticipated introducing a line of credit product in our Ontario locations during 2019, early test results we initiated in February of this year were incredibly favorable in terms of acquisition costs, credit performance, take-up rates, line utilization, and really the whole deal, so we moved up our -- we simply moved up our conversions schedule.

* * *

*So what does that mean? It means higher earning asset balances in our line of credit portfolio in Canada than previously forecasted, but lower yields and lower revenue while the book builds and higher provision when larger balance dollars are originated.*

We started the quarter with just over $53 million in non-single-pay – these are all U.S. dollars, by the way. We started the quarter with just over $53 million in non-single-pay balances, and we ended the quarter with $74.7 million, and having booked the kind of larger marketing and convergence plan in late June, the balances today sit at over $115 million, so great growth, all driven by tremendous customer communication and service by our store and call center teams in Canada.

149.    On August 2, 2018, the Individual Defendants caused the Company to submit Form

10-Q ("10-Q Q2 2018") with the SEC, which stated the following:

*Single-Pay revenues were affected primarily by regulatory changes in Canada (rate changes in Alberta, Ontario and British Columbia) and continued product shift from Single-Pay to Installment and Open-End loans in all countries.* Open-End revenues rose 72.2% on organic growth in the U.S. and the introduction of Open-End products in Virginia and Canada. Open-End adoption in Canada accelerated this quarter as related loan balances grew $34.3 million sequentially from the first quarter. Even with the accelerated Open-End growth, Single-Pay balances in Canada only shrank sequentially by $1.4 million.

* * *

Canada revenue improved $3.4 million, or 7.9%, to $47.0 million for the three months ended June 30, 2018 from $43.6 million in the prior year period. On a constant currency basis, revenue was up $1.6 million, or 3.6%. Revenue growth in Canada was impacted by the product transition from Single-Pay loans to Unsecured Installment and Open-End loans and the impact of regulatory rate changes in Alberta, Ontario and British Columbia.

{00226387.DOCX; 1 }

Single-Pay revenue decreased $1.6 million, or 4.6%, to $33.3 million for the three months ended June 30, 2018 and Single-Pay ending receivables decreased $1.1 million, or 2.2%, to $47.3 million from $48.4 million in the prior year period due to mix shift in Ontario where we launched Open-End loans in the fourth quarter of 2017.

Canadian non-Single-Pay revenue increased $5.0 million, or 58.4%, to $13.7 million compared to $8.6 million the same quarter a year ago on $31.9 million, or 74.5%, growth in related loan balances. The increase was primarily related to the launch of Open-End products in Alberta and Ontario in the fourth quarter of 2017.

The provision for losses increased $4.1 million, or 39.4%, to $14.4 million for the three months ended June 30, 2018 compared to $10.3 million in the prior year period, because of upfront provisioning on relative loan volumes (total Open-End and Installment loans grew sequentially by $20.9 million this second quarter compared to $10.9 million in the second quarter of 2017), and mix shift from Single-Pay loans to Unsecured Installment and Open-End loans. On a constant currency basis, provision for losses increased $3.5 million, or 33.7%.

## IX.  REVELATION OF THE TRUTH

150.  On October 24, 2018, the Individual Defendants caused CURO to report its financial results for Q3 2018. CURO reported revenue of $283 million, adjusted diluted EPS of $0.23, and a year-over-year earnings decline "primarily due to required up-front provisioning."

151.  Gayhardt divulged in the accompanying press release that CURO's results were "particularly affected by the acceleration of Open-End loan product in Canada" and "[t]he related upfront loan loss provisioning," which caused Canadian "net revenue and Adjusted EBITDA to drop by $10.9 million and $13.2 million sequentially." Canadian revenue also declined 8.8% year-over-year "primarily due to the continued product mix shift from Single-Pay," which was affected "primarily by regulatory changes in Canada (rate changes in Alberta, Ontario and British Columbia) leading to a shift to Open-End loans as well as a continued general product shift from Single-Pay to Installment and Open-End loans in all countries."

152.  Just months earlier the Individual Defendants' stated that CURO had "a very high degree of confidence" in not only achieving but also exceeding the full-year 2018 guidance.

Despite these monumental representations a few months earlier, in an abrupt manner the Company significantly cut its adjusted EPS guidance for 2018 to $1.84 to $1.88, down from $2.25 to $2.40, lowered adjusted net income guidance to $88 million to $91 million, down from $110 million to $116 million, and cut adjusted EBITDA guidance to $215 million to $218 million, down from $245 million to $255 million.

153.    During CURO's Q3 2018 earnings conference on October 25, 2018, Gayhardt stated "that this quarter fell short of our expectations, and probably your expectations, and quite simply, is not up to our standards."   Gayhardt divulged that nearly the entirety of the operating earnings shortfall related to the Company's "ongoing Canadian product migration and increased loan loss provision related to higher-than-expected loan growth," confirmed that "[b]y far the biggest impact to quarterly results was the ongoing product migration in Canada, specifically in the province of Ontario," and revealed that the Company was "dramatically reducing [its] Canadian Single-Pay revenue."

154.    Gayhardt also confirmed that "we completed the transition to [open-end] in Ontario and Alberta." In contrast to the Individual Defendants' prior representations that the loss provision in the second half of the year would run "about even" with revenue, the Company reported "loan loss as a percentage of revenue at 52.9%." Defendant Gayhardt reiterated that a "significant part" of the reduction in 2018 EPS guidance "relates to the allowance builds for line of credit product," i.e., the up-front provisioning required for open-end loans.

155.    Gayhardt implicitly admitted that given the rapid transition to open-end loans in Canada, the Individual Defendants knew that CURO's full-year 2018 earnings guidance was unachievable when it was re-affirmed on April 27 and July 31, 2018. Gayhardt stated: "we did a less than stellar job of explaining in our – probably our July call or even back into our April call .

.. the impact of this ... in the near term ... we probably didn't lay it out for everybody as explicitly as we probably should have.

156.   Defendants further disclosed that instead of phasing out single-pay loans over the course of a few years, the "transition to line of credit in Ontario and Alberta . . . was complete."

157.   Upon these revelations, CURO's stock price plummeted from $22.87 per share on October 24, 2018 to a close of $15.18 on October 25, 2018, a 34% decrease.

## A.   The Individual Defendants' Deception Toward Shareholders is Confirmed

158.   Individual Defendants Gayhardt, Dean and Baker spoke at the Stephens Conference on November 8, 2018. At the event, Gayhardt confirmed that the Individual Defendants decided in Q1 2018 to accelerate the transition from single-pay loans to open-end loans in Ontario from 2019 to 2018 and that the Individual Defendants deliberately decided not to moderate the rapidity of the loan transition despite knowing that they could have done so.

159.   Further, Gayhardt confirmed that the majority of the Ontario loan transition occurred in "May . . . June in honest," which was months before the Individual Defendants' deception during the second quarter earnings press release and conference call on July 30 and 31, 2018.

160.   On January 31, 2019, the Individual Defendants caused the Company to report its financial results for the fourth quarter 2018 ("Q4 2018") and the year-ended December 31, 2018, divulging that revenue from single-pay loans in Canada comprised only 7% of the Company's total revenue for Q4 2018, compared to 14.6% for the same time period in 2017. For full-year 2018 single-pay loans had decreased to 10% of the Company's total revenue, from 15% the prior year.

161.   On March 18, 2019, the Individual Defendants caused CURO to file the Form 10-K for the fiscal year ended December 31, 2018 ("2018 10-K"). The 2018 10-K concedes that the accelerated shift to open-end loans in Canada "came at the expense of single-pay loan balances" and that CURO's "disclosure controls and procedures were not effective" as of December 31, 2018.

162.   On May 6, 2019, the Individual Defendants caused CURO to file its Form 10-Q ("10-Q Q1 2019"), which divulged that CURO had "received an inquiry from the SEC regarding the Company's public disclosures surrounding its efforts to transition the Canadian inventory of products from Single-Pay loans to Open-End loans."

## X.   THE SECURITIES CLASS ACTION

163.   In 2018, the Securities Class Action was filed in the United States District Court for the District of Kansas. The consolidated complaint in the Securities Class Action named CURO, Individual Defendants Gayhardt, Rippel, Faulkner, and McKnight, and the FFL Defendants as defendants. The Securities Class Action concerned the same events described herein and defines the Class Period as between April 27, 2018 and October 24, 2018, inclusive.

164.   On December 3, 2019, the District Court rejected in full the defendants' motion to dismiss the Securities Class Action. The court held, based on the operative complaint's allegations, that there were indicia that Gayhardt, Rippel, Faulkner, McKnight, and the FFL Defendants defrauded CURO shareholders during the Class Period. In denying the defendants' motion, the court held the following:

Specifically, plaintiffs allege that defendants effectively admitted that they did a poor job explaining the near-term negative impact of the transition; that they decided to accelerate the transition to complete it in the second and third quarters of 2018, with that transition begun by June 2018; that most of the resulting losses occurred in July 2018 prior to the reaffirmance of the 2018 guidance at the end of that month; that the impact could have been lessened if the transition had occurred over a longer period, but that they decided against installing any such "speed

{00226387.DOCX; 1 }

bumps"; and that their disclosure controls were not effective. Defendants argue that they did not in those statements admit to committing fraud or to making knowingly false statements. Defendants have not argued or shown, however, that their post-period statements are not relevant. *The Court agrees with plaintiffs that these facts do support an inference that defendants were at least reckless in failing to disclose that the decision to accelerate the transition would call into question the accuracy of the 2018 guidance.*

\* \* \*

*Plaintiffs thus do not rely on one or two facts in alleging scienter, but rather have alleged a number of facts that support an inference of scienter for different reasons.* Defendants have attempted to attack those facts individually, but they have not persuaded the Court that the allegations, considered in their totality, are insufficient.

\* \* \*

Plaintiffs argue that the importance of that business creates an inference that defendants would have been closely monitoring that impact and thus would have appreciated the true short-term financial effect of the transition (thus supporting an inference of scienter) … *The Court agrees with plaintiffs that the importance of this business does support an inference that defendants closely monitored the transition and its effects, and thus supports an inference of scienter here.*

\* \* \*

Plaintiffs allege that defendants knew that the transition away from single-pay loans in Ontario would be successful (and thus would negatively impact short-term performance) based on the following facts: the transition coincided with a traditional time of increased demand; data showed a preference for open-end loans; defendants gained experience and data from the test transitions in Alberta and one market in Ontario; the company had data on the targeted customers; the transition targeted a particularly vulnerable demographic; defendants knew that the transition would affect loan loss provisioning; and the company aggressively marketed the transition. Defendants call such allegations speculative and note that plaintiffs did not include detailed allegations concerning the data that defendants received. *Nevertheless, defendants have not provided any basis to ignore these allegations, which do support plaintiffs' argument in favor of scienter.*

165.    The District Court stated the following in finding scienter against all defendants:

"Plaintiffs thus do not rely on one or two facts in alleging scienter, but rather have alleged a number

of facts that support an inference of scienter for different reasons. Defendants have attempted to

attack those facts individually, but they have not persuaded the Court that the allegations, considered in their totality, are insufficient." Thereafter, the Securities Class Action was settled with the payment by Defendants of $8,980,000 to CURO shareholders who purchased CURO stock during the class period. As a result, the Company suffered monetary and other damage as a result of the litigation and settlement of the Securities Class Action, including but not limited to monies paid by the Company out-of-pocket for its defense of the Securities Class Action.

## XI.    DAMAGES SUFFFERED BY CURO

166.    As a direct and proximate result of the Individual Defendants' conduct, CURO lost and will expend significant sums on money.

167.    Such expenditures include, but are not limited to, legal fees associated with the sustained Securities Class Action filed against the Company and the Individual Defendants, the settlement of same, and any internal investigations, and amounts paid to outside lawyers, accountants and investigators in connection thereto.

168.    Moreover, these expenditures include, but are not limited to, hefty compensation packages paid to and arranged for certain of the Individual Defendants who breached their fiduciary duties to the Company and are responsible for further wrongdoings against the Company.

169.    As a direct and proximate result of the Individual Defendants' conduct, CURO has also suffered and will continue to suffer loss of revenues and profits, loss of reputation and goodwill, as well as a "liar's discount" that will infect the Company's stock in the future due to the Individual Defendants' misrepresentations and breaches of fiduciary duties.

## XII.    DERIVATIVE ALLEGATIONS

170.    Plaintiffs bring this action derivatively and for the benefit of CURO to redress injuries suffered, and to be suffered, as a result of Individual Defendants' breaches of their fiduciary duties as directors and/or officers of CURO, abuse of control, waste of corporate assets,

{00226387.DOCX; 1 }

unjust enrichment, insider trading, the aiding and abetting thereof, and violations of the federal securities laws.

171.    CURO is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

172.    Plaintiffs are current shareholders of CURO and were shareholders of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiffs will adequately and fairly represent the interests of CURO in enforcing and prosecuting its rights.

## XIII.  DEMAND FUTILITY ALLEGATIONS

173.    Plaintiffs incorporate by reference and re-alleges each and every allegation stated above as if fully set forth herein.

174.    A pre-suit demand on the Board of CURO is futile and, therefore, excused. As of the filing of this action, the Board is comprised of the following eleven individuals: Individual Defendants Faulkner, Frawley, Gayhardt, Kirchheimer, Masto, McKnight, Rippel, Williams, and Winterhof (each of whom has served on the Board since at least April 2018) (for purposes of this section, these Defendants are referred to as the "Director Defendants"), and non-parties Gillian Van Schaick and Elizabeth Webster (these two directors joined after the Individual Defendants' misconduct described herein).

175.    Given the factual allegations set forth herein, Plaintiffs have not made a demand on the Board to bring this action against the Individual Defendants. A pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board are capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action.

176.   Under Delaware law, a shareholder derivative plaintiff need only demonstrate reason to doubt that a majority of the directors are disinterested or objective in order to establish pre-suit demand excusal. As set forth herein, Plaintiffs have adequately alleged that there is reason to doubt that at least six current directors of CURO are capable of disinterestedly and independently considering a demand to initiate and vigorously prosecute this action.

177.   First, the Board's decision to approve the Secondary Offering was not the product of a good faith exercise of business judgment and is not protected by the business judgment rule. Instead, the Board's decision is subject to the "entire fairness" standard, which the Director Defendants cannot meet. The Company's public filings clearly admit that CURO is controlled by the Founder Defendants (Faulkner, Rippel, and McKnight) and the FFL Defendants, and that they collectively had the ability to elect all of the members of CURO's Board and "thereby control[led] [CURO's] policies and operations, including the appointment of management." Accordingly, the Founder Defendants and the FFL Defendants exerted actual control over both CURO and the Board throughout the Relevant Period.

178.   As the Company's 2019 10-K explicitly states:

Friedman Fleischer & Lowe Capital Partners II, L.P. and its affiliated investment funds ("FFL Holders") and the original founders of the company ("Founder Holders") together own more than 50% of our common stock, and their interests may conflict with ours or yours in the future.

At December 31, 2019, FFL Holders and Founder Holders owned approximately 11.8% and 47.7%, respectively, of our outstanding common stock. As a result, the FFL Holders and the Founder Holders collectively have the ability to elect all of the members of our Board of Directors and thereby control our policies and operations, including the appointment of management. . . .

179.   Pursuant to the Secondary Offering, Founder Defendants Faulkner and McKnight and the FFL Defendants received substantial profits at artificially inflated prices. Founder Defendants Faulkner and McKnight each received $11 million in proceeds. Moreover, the FFL

Defendants sold CURO stock in the Secondary Offering for proceeds totaling $76 million. These Defendants received a personal financial benefit to the detriment of CURO. Because the Founder Defendants controlled the Board, they possessed the power to demand that the Board approve the Secondary Offering and had the power to require the remainder of the Board to sign the false and misleading Form S-1 in order to conduct the Secondary Offering.

180.    Second, an overwhelming majority (nine out of eleven) of CURO's present directors – Director Defendants Faulkner, Frawley, Gayhardt, Kirchheimer, Masto, McKnight, Rippel, Williams and Winterhof – are interested based on a substantial likelihood of liability given the admissions by Gayhardt during the October 25, 2018 earnings conference call, wherein Gayhardt apologized to stockholders for doing a "less than stellar" job "explain[ing]" the "near term" negative impact of the transition during the Company's April 27, 2018 and July 31, 2018 conference calls. Gayhardt further conceded that despite re-affirming guidance on July 30, 2018 and July 31, 2018, the "majority" of the losses stemming from the Ontario transition (which caused the Company to alter its FY18 guidance) actually occurred in "July" of 2018, *before* the Individual Defendants reaffirmed guidance. Accordingly, the only reasonable inference to be drawn from the allegations set forth herein is that Director Defendants Faulkner, Frawley, Gayhardt, Kirchheimer, Masto, McKnight, Rippel, Williams and Winterhof either knew of and approved the dissemination of public statements of false, unattainable guidance (in the 10-Q Q1 2018; the 10-Q Q2 2018; and the S-1) and/or decided not to correct such false statements in a timely manner, and/or consciously disregarded others' failure to correct such false statements in a timely manner. The Board is obligated to provide stockholders with truthful and accurate communications. These nine Director Defendants knowingly permitted false information to be presented to shareholders, and demand is

therefore futile as to Director Defendants Faulkner, Frawley, Gayhardt, Kirchheimer, Masto, McKnight, Rippel, Williams and Winterhof.

181.    Third, Director Defendants Faulkner, Frawley, Gayhardt, Kirchheimer, Masto, McKnight, Rippel, Williams and Winterhof violated their non-exculpable fiduciary duties of loyalty and good faith and they violated CURO's Ethics Code. CURO's ethics code must be adhered to by all Board members. The Ethics Code places regulations on the Director Defendants behavior, requiring each of them to ensure that the Company's public SEC filings were "full, fair, accurate, timely and understandable." Clearly, Director Defendants Faulkner, Frawley, Gayhardt, Kirchheimer, Masto, McKnight, Rippel, Williams and Winterhof breached their fiduciary duties and violated their duties under the Company's Ethics Code.

182.    Fourth, Director Defendants Gayhardt, Rippel, Faulkner and McKnight were named as individual defendants in the Securities Class Action, and in said action, the United States District Court for the District of Kansas denied in full the defendants' motion to dismiss despite the operative complaint's materially heightened pleading standards pursuant to the PSLRA. Director Defendants Gayhardt, Rippel, Faulkner and McKnight each faced a substantial likelihood of liability in the Securities Class Action and could not exercise disinterested and independent judgement regarding whether CURO should initiate this action. In fact, said Defendants settled the Securities Class Action and caused damage to CURO as a result.

183.    Fifth, the Board has stated in the Company's public filings that Director Defendant Gayhardt lacks independence as he is the Company's President and CEO. This was stated in CURO's most recent Proxy Statement on Form DEF 14A. Accordingly, there is further reason to doubt Gayhardt's independence.

184.    Sixth, the Board has stated in CURO's public filings, such as in the Proxy Statement on Form DEF 14A, that Director Defendants Faulkner, McKnight and Rippel lack independence because they "previously served as officers of the Company." Moreover, CURO conducted related party transactions with Founder Defendants Faulkner, McKnight, and Rippel each year through real estate leases. These Founder Defendants co-own a separate company which leases corporate office, collection office and certain retail store space to CURO annually for $3.4 million. In other words, Founder Defendants Faulkner, McKnight, and Rippel have and continue to personally receive CURO-derived revenues as part of the revenues generated in their independent business enterprise. Accordingly, there is also reason to doubt the independence of Founder Defendants Faulkner, McKnight and Rippel.

185.    Seventh, Director Defendants Williams, Frawley and Kirchheimer are interested as they each face a substantial likelihood of liability given their conduct as members of the Audit Committee. Director Defendants Williams, Frawley and Kirchheimer, as members of the Audit Committee, were required to assist the Board in monitoring, among other things, the integrity of the financial statements, reporting processes, and internal controls of the Company. Director Defendants Williams, Frawley and Kirchheimer were also required to discuss earnings press releases, discuss financial information and earnings guidance furnished to market analysts, and to review the effectiveness of the Company's internal controls over financial reporting. Director Defendants Williams, Frawley and Kirchheimer caused and/or permitted CURO to have and maintain ineffective internal controls over financial reporting, thereby causing and/or permitting the Company to disseminate false and materially misleading statements. This proposition is strengthened by CURO's 2018 10-K statement that its "disclosure controls and procedures were not effective" as of December 31, 2018. Director Defendants Williams, Frawley and Kirchheimer

breached their non-exculpable fiduciary duties by transgressing their obligations under the Audit Committee Charter, thereby subjecting each of them to a substantial likelihood of liability and rendering them unable to make a disinterested decision as to whether CURO should commence a lawsuit.

## COUNT I

## Against the Individual Defendants for Breach of Fiduciary Duty

186.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

187.    As CURO's directors and top officers, the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of CURO's business and affairs. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision by causing false and misleading statements and omissions of material fact to be disseminated.

188.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

189.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, CURO has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

190.    Plaintiffs on behalf of CURO have no adequate remedy at law.

## COUNT II

## Against the Individual Defendants for Unjust Enrichment

191.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

192.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, CURO.

193.    All the payments and benefits provided to the Individual Defendants were at the expense of CURO. The Company received no benefit from these payments.

194.    Plaintiffs, as shareholders and representatives of CURO, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

195.    Plaintiffs on behalf of CURO have no adequate remedy at law.

## COUNT III

## Against the Individual Defendants for Waste of Corporate Assets

196.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

197.    The wrongful conduct alleged concerning the dissemination of false and materially misleading statements was continuous and interlinked during the Relevant Period and caused significant damages to CURO.

198.    As a result of the wrongdoings, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying lavish compensation and bonuses to certain of its officers; (ii) awarding

self-interested stock options to certain officers and directors; and (iii) sustaining potentially millions of dollars of legal liability and/or the costs required to defend the ongoing Securities Class Action.

## COUNT IV

## Against the Individual Defendants for Abuse of Control

199.    Plaintiffs incorporate by reference and re-allege each and every allegation set above, as though fully set forth herein.

200.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence CURO, for which they are legally responsible.

201.    As a direct and proximate result of the Individual Defendants' abuse of control, CURO has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, CURO has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

202.    Plaintiffs on behalf of CURO have no adequate remedy at law.

## COUNT V

## Against Defendants Gayhardt, Rippel, Faulkner and McKnight For Contribution Under §§10(b) and 21D of The Exchange Act

203.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

204.    This claim is brought derivatively on behalf of CURO for contribution and indemnification against Individual Defendants Gayhardt, Rippel, Faulkner and McKnight, each of whom were defendants in the Securities Class Action.

{00226387.DOCX; 1 }

205.    CURO was a defendant in the Securities Class Action, which brought claims under the federal securities laws for, among other things, violations of §10(b) of the Exchange Act. Any liability on CURO will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of Individual Defendants Gayhardt, Rippel, Faulkner and McKnight, as alleged herein. CURO is entitled to receive contribution from those defendants in connection with the settlement of the Securities Class Action.

206.    As "controllers" of the Company, Individual Defendants Gayhardt, Rippel, Faulkner and McKnight had the power and/or ability to, and did, directly or indirectly control or influence the Company's business operations and financial affairs, including the content of public statements about CURO, and had the power and/or ability, directly or indirectly, to control or influence the specific corporate statements and conduct that violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

207.    Individual Defendants Gayhardt, Rippel, Faulkner and McKnight are also liable under §10(b) of the Exchange Act, 15 U.S.C. §78j(b), pursuant to which there is a private right of action for contribution, and §21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

208.    Accordingly, CURO is entitled to all appropriate contribution or indemnification from Individual Defendants Gayhardt, Rippel, Faulkner and McKnight, who are responsible for exposing CURO to liability under the federal securities laws.

## COUNT VI

### Against Defendants Faulkner and McKnight For Insider Trading

209.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

210.    By reason of their positions as directors, Individual Defendants Faulkner and McKnight had access to and knew material information regarding CURO and knew that public disclosure of this information would adversely affect the market price of CURO stock.

211.    Individual Defendants Faulkner and McKnight used CURO's non-public information in breach of their fiduciary duties to conduct the Secondary Offering and to sell CURO shares to the public when they knew that material, adverse information concerning CURO's business operations and prospects were undisclosed.

212.    Individual Defendants Faulkner and McKnight used their fiduciary positions to procure substantial and personal profits, at the expense of and to the detriment of CURO, and they must disgorge their unlawful profits to the Company.

## COUNT VII

### Against the FFL Defendants
### For Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty

213.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

214.    CURO's Board of Directors owe fiduciary duties to the Company, which they breached for the reasons set forth herein.

215.    The FFL Defendants, in conjunction with the Founder Defendants, controlled the Company. The FFL Defendants were aware of the Individual Defendants' fiduciary status. The FFL Defendants aided and abetted breaches of fiduciary duty, and they furnished significant support to the Individual Defendants' filing of false and misleading S-1 Registration Statement and prospectus, actions which were necessary to accomplish the FFL Defendants' insider trading and which assisted the Individual Defendants' breaches of their fiduciary duties owed to the Company.

{00226387.DOCX; 1 }

60

216.    The FFL Defendants unlawfully profited through aiding and abetting breaches of

fiduciary duty, and CURO has sustained damages.

## COUNT VIII

### Against the FFL Defendants
### For Aiding and Abetting Insider Trading

217.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth

above, as though fully set forth herein.

218.    The FFL Defendants knowingly participated in Individual Defendants Faulkner and

McKnight's insider trading by also partaking in the sale of shares at artificially inflated prices.

219.    In selling their CURO stock, as set forth above, the FFL Defendants used CURO's

non-public, material information for private gain.

220.    These FFL Defendants received substantial financial advantage through aiding and

abetting the insider trading of Individual Defendants Faulkner and McKnight, and they must

disgorge their unlawful profits.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.      Declaring that the Individual Defendants have breached or aided and abetted the

breach of their fiduciary duties to CURO;

B.      Determining and awarding to CURO the damages sustained by it as a result of the

violations set forth above from each of the Individual Defendants, jointly and severally, together

with pre-judgment and post-judgment interest thereon;

C.      Directing CURO and the Individual Defendants to take all necessary actions to

reform and improve its corporate governance and internal procedures to comply with applicable

{00226387.DOCX; 1 }

laws and to protect CURO and its shareholders from a repeat of the damaging events described herein;

D.      Equitable and/or injunctive relief, as permitted by law and equity, including attaching, impounding and imposing a constructive trust on or imposing such other legal remedy restricting the proceeds from the Individual Defendants' trading activities or their other assets in order to assure that Plaintiffs on behalf of CURO has an effective remedy;

E.      Awarding CURO restitution from the Individual Defendants, and each of them, including ordering disgorgement of all profits, benefits and other compensation obtained by Defendants through their wrongful conduct;

F.      Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

G.      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: July 16, 2021

By: /s/E. Wayne Taff
Earl Wayne Taff   No. 70588
Law Office of E. Wayne Taff
1133 Main Street, Suite 100
Blue Springs, Missouri 64015
816-229-2579
816-786-5083 (Cell)
877-518-1942 (Fax)
ewt@tafflawfirm.com

*Attorney for Plaintiffs*

Rusty Glenn
**SHUMAN, GLENN & STECKER**
600 17th Street, Suite 2800 South
Denver, CO 80202
Tel. (303) 861-3003
Email: rusty@shumanlawfirm.com

*Attorney for Plaintiff Watt*

Seth D. Rigrodsky
**RIGRODSKY & LONG, P.A.**
300 Delaware Avenue, Suite 1220
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: sdr@rl-legal.com

*Attorney for Plaintiff Ayers*

## VERIFICATION

I, Patrick Ayers, hereby verify that I am the plaintiff in this action, I have reviewed the allegations made in the foregoing complaint (the "Complaint"), and I have authorized the filing of the Complaint. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _9th_day of July, 2021.

*Patrick Ayers*
Patrick Ayers (Jul 9, 2021 13:42 EDT)

**PATRICK AYERS**